### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| MARY DANIELS, | : | Case No.1:12 CV 3023 |
| Plaintiff, | : | |
| v. | : | |
| MICHAEL ASTRUE[1], | : | **MEMORANDUM DECISION** |
| COMMISSIONER OF SOCIAL SECURITY, | | **AND ORDER** |
| | : | |
| Defendant. | | |

### I. INTRODUCTION.

In accordance with the provisions of 28 U. S. C. § 636(c) and FED. R. CIV. P. 73, the parties

consented to have the undersigned Magistrate Judge conduct all proceedings in this case and order

the entry of final judgment.  Plaintiff seeks judicial review of Defendant's final determination

denying her claim for Supplemental Security Insurance Benefits (SSI) under Title XVI of the Social

Security Act (Act).  Pending for review are the Briefs filed by the parties (Docket Nos. 17 & 18).

For the reasons that follow, the Magistrate Judge affirms the Commissioner's decision.

### II. PROCEDURAL BACKGROUND.

---

[1]

  On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security.  As Michael Astrue's successor, Ms. Colvin is automatically substituted as a party to this litigation, pursuant to FED. R. CIV. P. 15(d).

Plaintiff filed an application for SSI on September 21, 2009 alleging that her disability began on June 1, 2006 (Docket No. 7, pp. 147-152 of 478).  On January 22, 2010, the application was denied (Docket No. 10, pp. 82-84 of 478).  On May 17, 2010, the application was denied upon reconsideration (Docket No. 10, pp. 92-94 of 478).  A hearing was scheduled on March 2, 2011 (Docket No. 10, pp. 101-105 of 478).  Plaintiff made a timely request for hearing before an Administrative Law Judge (ALJ) and on March 2, 2011, ALJ Suzanne A. Littlefield conducted a hearing at which Plaintiff, represented by counsel, and Vocational Expert (VE) Nancy J. Borgeson appeared (Docket No. 10, pp. 13; 30; 100 of 478).  On September 23, 2011, the ALJ issueed a decision finding that Plaintiff had not been disabled within the meaning of the Act from September 21, 2009 through the date of the decision (Docket No. 10, pp. 14-25 of 478).  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on November 9, 2012, and the ALJ's decision became the final decision of the Commissioner (Docket No. 10, pp. 5-7 of 507).

### THE ADMINISTRATIVE HEARING.

In the hearing before ALJ Littlefield on March 2, 2011,  Plaintiff and the VE testified.  ALJ Littlefield explained that the unfavorable decision of the prior administrative law judge filed on August 28, 2009 governed the time period prior to September 21, 2009.

### 1.  PLAINTIFF'S TESTIMONY

Plaintiff testified that she could not work because she had a mood disorder, right arm pain, leg problems, Human Immunodeficiency Virus (HIV) symptoms, back problems and memory lapses.  The symptoms of the mood disorder included self-imposed isolation or seldom

2

wanting to go anywhere alone (Docket No. 10, pp. 40; 42; 44 of 478).

      With respect to her arm, it had a numb feeling most of the time.  This numbness prevented her from using her right hand to grip or otherwise hold anything too long. Fortunately, she was left-hand dominant (Docket No. 10, pp. 40, 41, 45 of 478).

      Plaintiff's leg pain was isolated between the knee and ankle.  She compared the pain to a "pulling or stretching" sensation.  Because of the pain, she had difficulty bending, kneeling, standing or walking longer than eight minutes.  After five minutes, the severity of her leg pain caused her to sit down.  She then sat down for five minutes before the pain recurred and she had to get up.  This cycle was destined to repeat itself several times each day limiting Plaintiff to sitting on her bed most of the time (Docket No. 10, pp. 42-43; 46 of 478).

      Plaintiff reported that her physician explained that HIV is accompanied by muscle thinning and possible tearing.  She considered her leg pain a side effect of her HIV (Docket No. 10, p. 42 of 478).

      The memory lapses manifested themselves in forgetting her telephone number and forgetting what she was watching on television.  As a precautionary measure, Plaintiff stayed home.  When she did venture outside of her house, she was accompanied by her daughters who assisted her with shopping once or twice monthly (Docket No. 10, pp. 44-45 of 478).

      Plaintiff estimated that her back hurt once or twice monthly.  For the pain, her physician had prescribed Tylenol #3.  Taking this medication along with rest caused the pain to "ease up" (Docket No. 10, pp. 46-47 of 478).

      During a typical day, Plaintiff spent six to eight hours lying down (Docket No. 10, p. 46 of 478).  Plaintiff occasionally cooked and assisted her daughters with the cleaning and laundry.

Plaintiff did not require assistance with bathing or getting dressed (Docket No. 10, pp. 45, 46 of 478).

### 2.    THE VE'S TESTIMONY.

The VE, a vocational rehabilitation specialist, stated that her testimony was consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT) and its companion publication SELECTED CHARACTERISTICS OF OCCUPATIONS (Docket No. 10, pp. 47-48; 100 of 478).

The VE advised that Plaintiff had been employed in two different packing jobs:  one in 1998 and another from November 2001 to March 2004.  These jobs were classified as medium in physical demands, unskilled and had a specific vocational preparation (SVP) of two.  SVP describes the amount of time the typical worker could learn the techniques, acquire the information, and develop the facility needed for average performance in the specified job.  The level two denoted that the time to learn, and develop skills as an average cleaner/housekeeper may have been anything beyond a short demonstration up to an including one month.

Plaintiff had done some housekeeping or cleaner/housekeeping jobs in a motel.  These jobs were light in physical demand and unskilled and similarly, had an SVP of two.  The VE explained that Plaintiff was also a self-employed babysitter or what the Department of Labor referred to as a baby monitor.  This job was classified as low semiskilled labor requiring medium exertion in physical demand and an SVP of three, a level of learning and developing the skills as an average baby monitor that exceeded one month but may have extended up to and including three months (Docket No. 10, pp. 48-49, www.onetonline.org/help/online/svp).

From May 2000 until September 2000, Plaintiff was employed as a kitchen helper at Best Western.  For four hours daily, Plaintiff was responsible for putting out the cereal at breakfast,

washing the dishes and cleaning the tables.  She lifted boxes weighing up to 25 pounds (Docket

No. 10, pp. 49-50 of 478).  Although Plaintiff performed this job at the light level, this job was

best classified in DOT as medium in physical demands and unskilled at an SVP of two.

### A.    HYPOTHETICAL QUESTION #1.

The ALJ proposed the following hypothetical:

Assume an individual of Plaintiff's same age,. . . . limited education and her
experience; that could do a full range of medium work but would be limited to
only occasional pushing and pulling with the dominant upper extremity; only
occasional ramps and stairs; and only occasional handling and fingering with the
dominant upper extremity. . . . the handling and fingering with the dominant
upper extremity would be frequent . . . no ladders, ropes or scaffolding; no
dangerous machinery or unprotected heights; and work limited to simple
repetitive tasks without fast-paced production.  Would such an individual be able
to do the Plaintiff's past work?

The VE opined that the hypothetical claimant could perform all of Plaintiff's past

relevant work (Docket No. 10, pp. 51-52 of 478).

### B.    HYPOTHETICAL QUESTION #2.

The ALJ proposed the following:

Assume an individual who could lift 50 pounds occasionally; 25 pounds
frequently; could stand and walk six out of eight hours of a workday with a
sit/stand option; the occasional pushing/pulling with the dominant hand; frequent
handling and fingering with the dominant hand; no ladders, ropes or scaffolding
or dangerous machinery, or heights, unprotected heights and then the same
simple, repetitive tasks without fast-paced production.  Could such an individual
do Plaintiff's past work?

The VE responded that this individual could perform Plaintiff's past work as a babysitter

but  she was uncertain that the individual could perform the other jobs, particularly packing, as

they did not permit a sit/stand option (Docket No. 10, pp. 52-53 of 478).

The VE excluded the housekeeping job from consideration as it was part-time work.  If

the job were full-time, the VE opined that the hypothetical individual could perform the job provided there was downtime during which the hypothetical individual could exercise the sit/stand option (Docket No. 10, p. 53 of 478).

The VE explained that there was one job that could be classified as medium and light in physical demand.  All jobs were unskilled and with an SVP of 2.  The following chart reflects the availability of jobs in Northeast Ohio, the State of Ohio and the national economies that the hypothetical individual could perform:

| JOB | DOT | NORTHEAST OHIO | STATE OF OHIO | NATIONALLY |
|-----|-----|----------------|---------------|------------|
| LAUNDRY WORKER-LIGHT WORK | 361.685-018 | 600 | 3,100 | 75,000 |
| STOCK HANDLER OR WAREHOUSE WORKER LIGHT WORK | 922.687-025 | 7,500 | 37,000 | 780,000 |
| LAUNDRY WORKER MEDIUM WORK | | 450 | 2,300 | 54,000 |

Fifty percent of these jobs would have a sit/stand option (Docket No. 10, pp. 53-54 of 478).

### C.     HYPOTHETICAL QUESTION #3.

Counsel posed the following hypothetical:

Assuming a claimant who was limited to lifting 20 pounds occasionally and 25 pounds frequently and fifty pounds occasionally but who could stand and walk for only two hours out of an eight-hour day; could occasionally push and pull with the dominant hand; frequently handle and finger. . . . could perform single and routine tasks and would be off task for approximately 15% of the workday.  . . .

Because this work limited standing to only two hours, the VE explained that this hypothetical individual would be effectively limited to work at the sedentary exertional level (Docket No. 10, pp. 54-55 of 478).  The VE further explained that the skills for these jobs were

6

job specific and would not transfer to other jobs (Docket No. 10, p. 57 of 478).

### III. TREATMENT HISTORY.

The ALJ must consider Plaintiff's subjective testimony about symptoms, the inability to work and perform activities, the VE's objective testimony and weigh these findings with all of the medical evidence that tends to prove disability.   A summary follows of medical evidence presented by Plaintiff that was material to the ALJ's determination of Plaintiff's inability to work, her functional limitations and ultimately, whether she is disabled within the meaning of the Act.

On March 29, 2009, Plaintiff was treated at LUTHERAN HOSPITAL for facial and nasal pain which by that time had persisted for one week.  The attending physician, Dr. Elizabeth Perstin, M. D., found no evidence of bacterial infection and no cervical swelling or morbid enlargement of the lymph nodes.  Plaintiff was prescribed Taradol, a medication used short-term to treat moderate to severe pain, to treat acute sinusitis (Docket No. 10, pp. 245-249 of 478; STEDMAN'S MEDICAL DICTIONARY 7110 (27th ed. 2000); www.drugs.com)).

On January 3, 2009, Dr. Chintan V. Shah, a resident in the METROHEALTH SYSTEM (MHS) FAMILY PRACTICE DEPARTMENT supervised by Dr. Heather Mullen, M. D., a family practitioner, treated Plaintiff for an earache and a skin eruption.  The inflammation of the outer ear and ear canal were treated with an antibiotic and ear drops and the nonspecific skin eruption on the neck was treated with the application of a topical ointment.  Dr. Mullen conducted an independent physical examination and concurred in Dr. Shah's health maintenance plan (Docket No. 10, pp. 267-269 of 478; www.healthgrades.com/physician/dr-chintan-shah-xv3fj; www.healthgrades.com/physician/dr-heather-mullen-2xxc5).

For several years thereafter, Plaintiff presented to the at MHS MEDICAL CARE CLINIC for routine checks of her HIV status.  During each visit, the attending physician reviewed Plaintiff's health maintenance record, HIV flow sheet results and immunization record.  On April 14, 2009, Dr. Dalla El-Beijjani, an infectious disease medicine specialist, continued the current drug regimen, prescribed Zithromax or a Z-pack and encouraged Plaintiff to cease smoking (Docket No. 10, pp. 262-264 of 478; www.healthgrades.com/physician/dr-dalia-elias-el-bijjani-xjn86;).

On April 29, 2009, Dr. Nicola A. Helm, an infectious disease medicine specialist, continued the current drug regimen (Docket No. 10, pp. 259-261 of 478www.healthgrades.com/physician/dr-nicola-helm-xc6ph).

On May 4, 2009, blood chemistry testing was administered in the MHS PATHOLOGY DEPARTMENT to determine Plaintiff's level of lymphocytes or the white blood cells formed in lymphatic tissue throughout the body that in normal adults make up approximately 22-28% of the total number of leukocytes in the circulating blood.  The results showed a normal distribution of lymphoid subset markers (Docket No. 10, pp. 270-273 of 478; STEDMAN'S MEDICAL DICTIONARY 234920 (27th ed. 2000)).

Plaintiff presented to the MHS ARTHRITIS CLINIC on June 17, 2009, complaining of pain that permeated her body.  Dr. Rebecca Jeyaseelan, a resident supervised by Dr. Cheung Cho Yue, an internist, diagnosed Plaintiff with neuropathic pain syndrome, possibly fibromyalgia. Dr. Yue adopted the treatment plan which included a clinical trial to investigate the effectiveness of Elavil, an antidepressant (Docket No. 10, pp. 256, 257 of 478; PHYSICIAN'S DESK REFERENCE, 2006 WL 371981 (2006); www.vitas.com/doctors/Dr_Cheung_Yue.html)

Plaintiff visited the MHS INFECTIOUS DISEASE DEPARTMENT on June 25, 2009, where she

was assessed for contraindications to immunizations.  Plaintiff was encouraged to increase the dosage of Elavil (Docket No. 10, p. 251 of 478).

During the follow-up HIV visit on June 26, 2009, Dr. Helm noted that Plaintiff had lost some weight and she continued to suffer pain in her feet.  Upon review of her health maintenance record, HI flow sheet and immunization record, Dr. Helm continued the current regimen (Docket No. 10, pp. 251-254 of 478).

On October 22, 2009, Dr. Helm continued the current regimen and considered incorporating drug therapy generally used in the treatment of gastrointestinal reflux and abdominal pain (Docket No. 10, pp. 275-280 of 478).

On November 12, 2009, Plaintiff presented to MHS RENAL CLINIC where nephrologist, Dr. Thomas Zipp, opined that Plaintiff probably had non-nephrotic proteinuria dating back to 2005.  The diagnostic x-rayss showed that both of Plaintiff's kidneys were normal in size; however, he could not rule out renal disease for the reasons that the total protein in Plaintiff's urine and the total protein to creatinine ratio were all elevated (Docket No. 10, pp. 327-336 of 478; www.healthgrades.com/physcin/dr-thomas-zipp-2ggb6).

Plaintiff presented to the MHS FAMILY PRACTICE DEPARTMENT on November 19, 2009, complaining of worsening myalgia pain in her left upper and lower extremity, upper back and right shoulder and tingling and numbness in her hands and feet.  Dr. Hemalatha C. Senthilkumar, a family practitioner, reviewed all of Plaintiff's systems, noting the presence of mild distal gastritis and some evidence of cord compression with narrowing of the neural foramina.  A recommendation was made to screen Plaintiff for sexually transmitted diseases and malignant neoplasm of the cervix (Docket No 10, pp. 325-326 of 478).

Dr. Gary Hinzman, M.D., completed a PHYSICAL RESIDUAL FUNCTIONAL CAPACITY

9

ASSESSMENT form on January 8, 2010. Considering Plaintiff's primary and secondary diagnoses as HIV positive and chronic pain, non specific, respectively, Dr. Hizman opined that based on all of the evidence in the file, including clinical and laboratory findings, symptoms and his own reasoned judgment, Plaintiff had no communicative, environmental, visual and manipulative limitations. She did have the following exertional limitations:

1. Occasionally lift and/or carry fifty pounds.
2. Frequently lift and/or carry twenty-five pounds.
3. Stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday.
4. Sit with normal breaks for a total of about six HOURS IN AN EIGHT-HOUR WORKDay.
5. Push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry (Docket No. 10, pp. 281-288 of 478).

On January 12, 2010, Dr. David V. House, Ph. D., conducted a clinical interview based upon behavioral observations and background information provided by the Bureau of Disability Determination. Dr. House opined that Plaintiff suffered from a diagnosis of mood disorder secondary to HIV infection, with major depressive features including frequent panic attacks and nicotine dependence. Her ability to:

1. Maintain attention and concentration, persistence and pace to perform simple repetitive tasks was moderately limited due to depression.
2. Understand, remember and follow directions was not limited.
3. Withstand stress and pressure associated with day-to-day work activity was markedly limited due to mood issues including frequent panic attacks secondary to HIV.
4. Relate to others and deal with the general public including fellow workers and supervisors appeared to be mildly limited.
5. Adapt was moderately limited.
6. Use her insight into her current situation and overall judgment appeared to be no worse than mildly limited.

Dr. House categorized the different aspects of Plaintiff's disorder or disability based on the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, which organizes each psychiatric diagnosis into five dimensions (axes):

10

| Axis | What it measures | Dr. House's diagnoses |
|------|------------------|-----------------------|
| I | All diagnostic categories except mental retardation and personality disorder | A mood disorder secondary to HIV infection with major depressive features including frequent panic attacks and nicotine dependence |
| II | Personality disorders and mental retardation | No diagnoses |
| III | General medical condition; acute medical conditions and physical | Dr. House recommended that the reader refer to the medical report disorders |
| IV | Psycho-social and environmental factors contributing to the disorder | Psycho-social stressors include apparent unemployment and some social isolation along with frequent panic attacks and other forms of depression related to HIV |
| V | Global Assessment of Functioning (GAF), a numeric score used by mental health clinicians and physicians to rate subjectively the social, occupational and psychological functioning of adults. | Plaintiff's GAF was 49 or a score that denotes serious symptoms (ex: suicidal ideation, severe obsessive rituals) or any serious impairment in social, occupational or school functioning (ex no friends, unable to hold a job) |

(Docket No. 10, pp. 290-295 of 478).

Dr. Leslie Rudy, Ph. D., completed both a MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT (MRFC) and a PSYCHIATRIC REVIEW TECHNIQUE (PRT) form on January 20, 2010. In the MRFC, Dr. Rudy's summary conclusions were derived from evidence in the file within the context of Plaintiff's capacity to sustain that activity over a normal workday and workweek on an ongoing basis.  She concluded that Plaintiff had no marked limitations but he did have moderate limitations in the ability to:

1.  Understand and remember detailed instructions.
2.  Carry out detailed instructions.
3.  Maintain attention and concentration for extended periods.
4.  Complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.
5.  Interact appropriately with the general public.
6.  Respond appropriately to changes in the work setting.

(Docket No. 10, pp. 296-298 of 478).

In the PRT, Dr. Rudy conducted an assessment for the period of September 21, 2009 through January 20, 2010, basing the medical disposition on an affective disorder and a mood

disorder secondary to physical condition (Docket No. 10, pp. 300-309 of 478).  In the "B"

criteria of the Listings, Dr. Rudy indicated to what degree the following functional limitations

exist as a result of her mental disorder:

| | |
|---|---|
| Restriction of activities of daily living | Mild |
| Difficulties in maintaining social functioning | Moderate |
| Difficulties in maintaining concentration, persistence or pace | Moderate |
| Episodes of decompensation, each of extended duration | None. |

Dr. Rudy found no evidence that established the presence of the "C" criterion which reflects the

existence of extremely severe mental conditions (Docket No. 10, pp. 310-311 of 478).

Plaintiff was examined by Dr. Helm at MHS on October 15, 2010, for HIV health

maintenance.  The medication regimen was continued (Docket No. 10, p. 318 of 478).

Dr. Zipp at MHS conducted follow up visits on January 7, 2010.  Plaintiff was recovering

from a urinary tract infection and Dr. Zipp noted that both kidneys were normal in size.

Although there was no dilation of the pelvis and calices (a flower-shaped or funnel-shaped

structure; specifically one of the branches or recesses of the pelvis of the kidney into which the

orifices of the malpighian renal pyramids project) in one or both kidneys, he could not rule out

renal disease.  The bilateral renal cysts appeared "simple" (Docket No. 10, pp. 321-322 of 478;

STEDMAN'S MEDICAL DICTIONARY 60590 (27th ed. 2000)).

On February 9, 2010, Plaintiff complained that her left arm kept going numb and her left

leg, arm and feet hurt.  Dr. Zipp attributed the pain to HIVAN (HIV associated nephropathy) and

continued her on the current medications (Docket No. 10, pp. 323-324 of 478).

On February 25, 2010, Plaintiff complained of having a cough (yellow sputum), runny

nose and no fever.  Dr. Laportia McElrath, a resident at the MHS INFECTIOUS DISEASE

DEPARTMENT, continued Plaintiff on the same antiretroviral medications (Docket No. 10, pp.

315-320 of 478).

Dr. Marc D. Winkelman, a neurologist, of the MHS NEUROLOGY DEPARTMENT, examined Plaintiff on April 30, 2010, after she complained of left lower extremity pain.  Dr. Winkelman diagnosed Plaintiff with sciatica, probably due to lesion of the L-S1 root.  He suspected the cause could be ankylosis of the spine but could not definitively make that determination because of the HIV (Docket No. 10, pp. 343-347 of478; STEDMAN'S MEDICAL DICTIONARY 382100 (27th ed. 2000)).  Plaintiff was treated at LUTHERAN HOSPITAL on May 3, 2010 for low back pain.  The X-ray of the lumbar spine showed normal alignment, disc spaces and vertebral body heights.  Plaintiff was diagnosed with a pinched nerve for which she was prescribed narcotic pain medication (Docket No. 10, pp. 387-384 of 478).

On May 11, 2010, Plaintiff presented to Dr. Zipp at MHS after being diagnosed with a pinched nerve at the LUTHERAN HOSPITAL several days prior.  She had stopped the medication once her pain stopped.  Now she was seeking pain relief.  Because of the acute renal failure, Dr. Zipp stopped prescribing Cozaar®, an angiotensin receptor antagonist that keeps blood vessels from narrowing and lowers blood pressure (Docket No. 10, pp. 347-348 of 478; PHYSICIAN'S DESK REFERENCE, 2006 WL 374505 (2006)).

An MRI of the lumbar spine was administered on May 11, 2010 and the results showed degenerative disc protrusion at L3-4 and degenerative disc bulge at L4-5 that did not cause any nerve root compression (Docket No. 10, p. 359 of 478).

On May 29, 2010, Dr. Helm referred Plaintiff to the MHS REHABILITATION PSYCHOLOGY DEPARTMENT.  There, Dr. Kelly L. Wadeson, Ph.D., and Plaintiff agreed that she had no cognitive problems and therefore, a neuropsychological evaluation would not benefit Plaintiff (Docket No. 10, p. 349 of 478).

Plaintiff had new onset vomiting and nausea whenever she ate.  She presented to Dr. Monica Reddy, an attending/teaching physician at MHS on June 24, 2010.  Apparently the consumption of Cozaar®, was directly related to significant proteinuria.  Dr. Reddy began Plaintiff on medications designed to provide symptomatic relief in stimulating Plaintiff's appetite and relieving the constipation and nausea (Docket No. 10, pp. 350-354; 388-395 of 478).

Plaintiff presented to the MHS RENAL DEPARTMENT on June 30, 2010, with acute renal failure.  On the following day, Dr. Zipp modified her medication regimen (Docket No. 10, pp. 356-358 of 478).

On July 6, 2010, Dr. Helm changed the medication regimen.  The diagnostic evidence apparently showed improvement in Plaintiff's creatinine levels (Docket No. 10, pp. 401-405 of 478).

Dr. Zipp noted on August 16, 2010, that Plaintiff had been on the new medication and had not had any new problems.  Plaintiff's appetite had improved, she had no nausea, she was more energetic and she gained some weight (Docket No. 10, pp. 405-407 of 478).

Dr. Winkelman saw Plaintiff on August 24, 2010, noting that Plaintiff had some pain in the soft tissues of her limbs and she had lost the right ankle jerk.  Dr. Winkelman referred Plaintiff for physical therapy (Docket No. 10, pp. 414-420 of 478).

On September 15, 2010, Plaintiff was evaluated by Danielle Joliff, a physical therapist, whose plan was to assist with decreasing Plaintiff's range of motion, strength and flexibility.  On September 22, 2010, Plaintiff's pain level was 6.5 of 10 in low back radiating into the posterior thighs and from the calves to the toes.  Another physical therapist, Elizabeth Musser, prescribed aqua therapy.  Plaintiff could withstand 40 minutes of the pool program without an increase in

14

symptoms.  Even with the physical and water therapies, Plaintiff's low back and left hip pain

levels continued to vary:

1.   6.5 of 10 on September 24, 2010.
2.   5.5 of 10 on September 29, 2010.
3.   6 of 10 on October 8, 2010.
4.   8 of 10 on October 13, 2010.
5.   9 of 10 on October 15, 2010
6.   9 of 10 on October 18, 2010

Having failed to complete 10 visits, Plaintiff did not meet her therapy goals (Docket No.

10, pp. 421-458 of 478).

Plaintiff presented to Dr. Helm for follow-up care on July 20, 2011 and November 17,

2011.  Plaintiff's creatinine levels improved and the current drug therapy was continued (Docket

No. 10, pp. 460-471 of 478).

Dr. Helm saw Plaintiff on April 18, 2012, and noted that she was doing well.  Plaintiff's

weight had dipped below 100 pounds but that was not unusual for her.  She was having some

nasal congestion and was taking her HIV medications as directed.  Plaintiff's renal function was

stable with a creatinine level of 1.45 (Docket No. 10, pp. 474-478 of 478).


**IV. STANDARD OF DISABILITY**.

To be eligible for SSI, a claimant must be under a "disability" as defined by the Act at 42

U.S.C. § 423(d) (1)(A).  A "disability" includes physical and/or mental impairments that are both

"medically determinable" and severe enough to prevent a claimant from (1) performing his or

her past job and (2) engaging in "substantial gainful activity" that is available in the regional or

national economies. 42 U. S. C. § 423(d) (Thomson Reuters 2013).  A SSI claimant bears the

ultimate burden of establishing that he or she is disabled under the Act's definition.  *Key v.*

*Callahan*, 109 F.3d 270, 274 (6th Cir.1997).

When determining whether a person is entitled to disability benefits, the Commissioner follows a sequential five-step inquiry.  20 C.F.R. § 404.1520 (Thomson Reuters 2013).  The Sixth Circuit has summarized the five steps as follows:

1. If a claimant is doing substantial gainful activity—i.e., working for profit—she or he is not disabled.

2. If a claimant is not doing substantial gainful activity, his or her impairment must be severe before she or he can be found to be disabled.

3. If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his or her impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If a claimant's impairment does not prevent him or her from doing past relevant work, she or he is not disabled.

5. Even if a claimant's impairment does prevent him or her from doing past relevant work, if other work exists in the national economy that accommodates his or her residual functional capacity and vocational factors (age, education, skills, etc.), he or she is not disabled.

*Smith v. Commissioner of Social Security*, 2013 WL 645535, *1 at fn. 1 (N.D.Ohio,2013) (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir.1990); *Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir.2001)).

At the first four steps, the social security claimant has the burden of going forward with the evidence,  and the Commissioner has the burden at step five to show that alternate jobs in the economy are available to the claimant, considering his or her age, education, past work experience and residual functional capacity.  *Garris v. Commissioner of Social Security*, 2013 WL 3990754, *6 (N.D.Ohio,2013) (*see Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir.1990)).

## V. The ALJ's Decision.

After careful consideration of the entire record, ALJ Littlefield made the following

16

findings of fact and conclusions of law on September 23, 2011:

1.  Plaintiff had not engaged in substantial gainful activity since September 21, 2009, the application date.

2.  Plaintiff had the following severe impairments:  myalgia (muscular pain), carpal tunnel syndrome, HIV infection and depression.

3.  Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F. R. art 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, 416.926).

4.  After careful consideration of the entire record, the ALJ found that Plaintiff had the residual functional capacity to perform medium work except that Plaintiff could push/pull with the dominant upper extremity no more than occasionally; she could climb ramps and stairs no more than occasionally; she could handle and finger with the dominant upper extremity no more than frequently; she was restricted from ladders, ropes and scaffolds as well as hazards such as dangerous machinery or unprotected heights; and Plaintiff was limited to simple, repetitive tasks without fast paced production and she required a sit/stand option.

5.  Plaintiff was capable of performing past relevant work as a babysitter/child monitor.  This work did not require the performance of work related activities precluded by Plaintiff's residual functional capacity.

6.  Plaintiff was not under a disability, as defined in the Act from September 21, 2009 through the date she filed her application (Docket No. 10, pp. 17-25 of 478; STEDMAN'S MEDICAL DICTIONARY 263770 (27th ed. 2000)).

## V. THE STANDARD OF REVIEW.

Exclusive jurisdiction over Social Security benefit cases arises from 42 U.S.C. § 405(g), which states in relevant part that a claimant may obtain  [judicial] review by a civil action of any final decision by the Commissioner of Social Security made after hearing to which he or she was a party.  A final decision is one rendered after the claimant has completed the four-step administrative review process, the last step being a review by the Appeals Council.  20 C. F. R. § 404.900(a) (Thomson Reuters 2013).

Judicial review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Gayheart v.*

17

*Commissioner of Social Security*, 710 F.3d 365, 374 (6ᵗʰ Cir. 2013) (*citing Cole v. Astrue*, 661 F. 3d 931, 937 (6ᵗʰ Cir. 2011) (internal quotation marks omitted)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (*citing Heston, supra*, 245 F.3d at 534) (internal quotation marks omitted)).

The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6ᵗʰ Cir. 1994). The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. *Id.*

If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm. *Id.* But "[a]n ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Gayheart, supra,* (*citing Cole, supra*, 661 F.3d at 937) (internal quotation marks omitted)).

## VII. ANALYSIS.

A. **PLAINTIFF CONTENDS THAT THE ALJ ERRED BY FAILING TO CONSIDER PLAINTIFF'S CONDITION UNDER 5.08 OF THE LISTING. PLAINTIFF ARGUES THAT SINCE THERE IS NO SPECIFIC LISTING THAT ADDRESSES WEIGHT LOSS CAUSED BY HIV, THE ALJ SHOULD HAVE CONSIDERED LISTING 5.08 AS A COMPARATIVE LISTING. THE ISSUE HERE IS WHETHER ON REMAND, THE ALJ MUST CONSIDER THIS COMPARATIVE SECTION OF THE LISTING IN ASSESSING WHETHER PLAINTIFF WAS DISABLED.**

In the third step of the analysis to determine entitlement to SSI, the claimant has the burden of showing that he or she meets the Listing or his impairments are medically equivalent to a listed impairment. *Ridge v. Barnhart*, 232 F. Supp. 2d 775, 787 (N.D.Ohio 2002) (*see Evans v. Secretary of Health and Human Services*, 820 F. 2d 161, 164 (6ᵗʰ Cir. 1987)). In order to meet a listed impairment, the claimant must show that his or her impairment meets all of the requirements for a listed impairment. *Id.* (*citing Hale v. Secretary*, 816 F. 2d 1078, 1083 (6ᵗʰ Cir.

18

1987)).

1.    **LISTING 5.08–DIGESTIVE SYSTEM** states in relevant part:

A. . . . . . . . .Disorders of the digestive system include gastrointestinal hemorrhage, hepatic (liver) dysfunction, inflammatory bowel disease, short bowel syndrome, and malnutrition.  They may also lead to complications, such as obstruction, or be accompanied by manifestations in other body systems.
B.   .....We need a record of your medical evidence, including clinical and laboratory findings.  The documentation should include appropriate medically acceptable imaging studies and reports of endoscopy, operations, and pathology, as appropriate to each listing, to document the severity and duration of your digestive disorder.  Medically acceptable imaging includes, but is not limited to, x-ray imaging, sonography, computerized axial tomography (CAT scan), magnetic resonance imaging (MRI), and radionuclide scans.  Appropriate means that the technique used is the proper one to support the evaluation and diagnosis of the disorder.  The findings required by these listings must occur within the period we are considering in connection with your application or continuing disability review . . .
5.08  Weight loss due to any digestive disorder despite continuing treatment as prescribed, with BMI of less than 17.50 calculated on at least two evaluations at least 60 days apart within a consecutive 6–month period.

20 C.F.R. Pt. 404, Subpt. P, App. 1 (Thomson Reuters 2013).

2.    **THE MAGISTRATE'S ANALYSIS**.

Here, Plaintiff's body mass index arguably met the criteria of the Listing being less than

17.50 over a six-month period of time.   In reviewing various portions of the medical record, Dr.

Zipp noted that Plaintiff was generally a poor eater and traditionally her weight loss was

episodic.  Dr. Helm opined that Plaintiff probably had gastrointestinal reflux.  Dr. Reddy treated

Plaintiff for new onset vomiting and nausea which occurred whenever she ate.

Consistent with her symptoms, Plaintiff may have suffered from malnutrition because of

her inability to eat.  In April 2012, the nausea had been resolved and Plaintiff's appetite

improved (Docket No. 10, p. 368 of 478).  She even gained a small amount of weight (Docket

No. 10, pp. 405, 409 of 478).  The ALJ referred to Plaintiff's weight loss and the fact that once

her medication regime was changed, the situation was reversed (Docket No. 10, p. 21 of 478).

19

The evidence does not precisely demonstrate that Plaintiff had a gastrointestinal hemorrhage, a hepatic dysfunction, an inflammatory bowel disease, a short bowel syndrome or malnourishment. Neither has Plaintiff shown that the less severe symptomology of weight loss, nausea nor pain is medically equivalent to a digestive disorder.  Moreover, the failure of any treating physician to diagnose her with these disorders further distinguishes Plaintiff's impairment from those in the Listing.

Because Plaintiff cannot satisfy the threshold requirement of Listing 5.08, the Magistrate declines to remand this case to the Commissioner to determine if she meets Listing 5.08.

**3.**    **LISTING 14.08(H)**.

Listing 14.08(H).  HIV wasting syndrome, characterized by involuntary weight loss of 10 percent or more of baseline (computed based on pounds, kilograms, or body mass index (BMI)) or other significant involuntary weight loss as described in 14.00F5, and in the absence of a concurrent illness that could explain the findings.  With either:

    1.    Chronic diarrhea with two or more loose stools daily lasting for 1 month or longer; or
    2.    Chronic weakness and documented fever greater than 38°C (100.4°F) for the majority of 1 month or longer

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 14.08(H) (Thomson Reuters 2013).

she was required to explain how she arrived at this decision.

**4.**    **THE MAGISTRATE'S ANALYSIS**.

The undersigned Magistrate Judge finds that the ALJ declared that she considered 14.08(H) in determining whether Plaintiff had an impairment that medically met or equaled the listing (Docket No. 10, p. 19 of 478).  Even assuming that Plaintiff suffered from involuntary weight loss consistent with the requirements of Listing 14.08(H), by her own admission, Plaintiff

did not complain of loose stools, chronic fever or weakness.  Under these circumstances, the fact that no physician mentioned findings equivalent to chronic diarrhea or fever as a symptom made it impossible for the ALJ to have found that Plaintiff met or equaled Listing 14.08(H).

Because Plaintiff cannot satisfy the threshold requirements and the ALJ represents that she considered the requirements of Listing 14.08, the Magistrate declines to remand this case to the Commissioner to determine if she meets the requirements of Listing 14.08(H).

### B.  PLAINTIFF CONTENDS THAT THE ALJ IMPROPERLY ASSESSED HER PAIN AND WEAKNESS AS A DISABILITY.

Plaintiff argues that her pain and weakness are of the severity that they may well constitute a disabling disorder.  It is Plaintiff's contention that the ALJ erred in failing to find that these symptoms are disabling because the underlying impairments or causes of the pain and weakness are medically determinable and supported by objective medical evidence.  .

### 1.  STANDARD FOR ADJUDGING PAIN AS A DISABILITY.

A claimant's subjective statements concerning her symptoms are not enough to establish disability.  *Ward v. Commissioner of Social Security*, 2013 WL 3006353, *21 (N.D.Ohio,2013) (*citing Brewer v. Astrue*, 2012 WL 262632, *9 (N.D.Ohio,2012) (*See* POLICY INTERPRETATION RULING TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, SSR 96-7p, 1996 WL 374186, INTRODUCTION (July 2, 1996)).  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *Id*. (*citing Brewer*, 2012 WL 262632, at *9).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment.  *Id.* (*citing Brewer*, 2012 WL 262632, at *9).  Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms."  *Id.* (*citing Brewer*, 2012 WL 262632, at *9) (*see Siterlet v. Secretary of Health and Human Services*, 823 F.2d 918,

920 (6th Cir.1987)).

2.    THE APPLICATION.

The Magistrate finds that there was minimal objective medical evidence to confirm the alleged severity of pain and weakness brought about by Plaintiff's symptoms or impairments. Nevertheless, the ALJ identified both prongs of the test (Docket No. 11, p. 21 of 478).  Next, the ALJ considered Plaintiff's medically determinable impairments, specifically, myalgia, carpal tunnel syndrome, HIV infection and depression and the effect that these impairments could have had on the pain and weakness alleged (Docket No. 10, pp. 19-20 of 478).  Then the ALJ considered Plaintiff's complaints about the pain and the resulting weakness, beginning in her ankle/foot and radiating up the entire side of the body, her reports that her legs hurt 24/7, that the pain was generally at a level of 7 on good days and 10 on bad days, that she had five bad days and two good days weekly and that she generally did not want to do anything because of the depression (Docket No. 10, p. 21 of 478).

Referring to the Plaintiff's own statements about the intensity and persistence of the symptoms, it was evident that Plaintiff had no back pain because it was effectively treated with medication.  The ALJ referred to Plaintiff's limitations resulting from the pain and her attempts to improve or control the pain through physical and/or aqua therapy (Docket No. 10, p. 21 of 478).

Considering that few medical professionals diagnosed Plaintiff with an underlying medically determinable physical impairment capable of causing such intense pain and weakness, the ALJ relied on the documented medical evidence and its assessment of the medical condition and the severity of alleged pain and weakness related to that condition.  The ALJ also incorporated references to the diagnostic tests interpreted by Dr. Senthilkumar, the results of

22

which did not show significant nerve root compression or any significant canal encroachment. Moreover, the imaging did not confine Plaintiff's symptoms specifically to the left side.  Finally, the ALJ was persuaded by Plaintiff's testimony that the pain medications were adequate to treat her back pain (Docket No. 10, pp. 21-22 of 478).

The ALJ followed the rules and conducted the appropriate two-step pain analysis.  Her conclusions fall within the "zone of choice" wherein the ALJ can make a decision that is based on substantial evidence without interference by this Court.  Accordingly,  the undersigned finds that the ALJ's decision as it relates to the assessment of Plaintiff's complaints of pain and weakness should be affirmed.

     **C.**     **PLAINTIFF CONTENDS THAT THE ALJ COMMITTED HARMFUL ERROR BY FAILING TO INCLUDE MENTAL NON-EXERTIONAL LIMITATIONS BASED ON SOCIAL FUNCTIONING IN HER ULTIMATE RESIDUAL FUNCTIONAL CAPACITY.**

Plaintiff argues that the ALJ should have found a much more restrictive residual functional capacity because of her moderate limitations in social functioning.

     **1.**     **THE STANDARD FOR FINDING RESIDUAL FUNCTIONAL CAPACITY.**

"Residual functional capacity" is defined as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." *Gillis v. Commissioner of Social Security*, 2013 WL 1694844, *15 (N.D.Ohio,2013) *adopted by* 2013 WL 1694809 (N.D.Ohio 2013) (*citing Prescott v. Astrue*, 2012 WL 3403604, *12 (M.D.Tenn.,2012) *adopted by*, 2012 WL 3402813 (M.D.Tenn., 2012) (unreported) (*citing* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c)).  With regard to the evaluation of physical abilities in determining a claimant's residual functional capacity, the Regulations state:

23

When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

*Id.* (*citing* 20 C.F.R § 404.1545(c)).

According to SSR 96–8p:

Residual functional capacity is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities.  The residual functional capacity assessment must be based on all of the relevant evidence in the case record.

*Id.* (*citing* TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, *2, *5 (July 2, 1996)).

### 2.     THE MAGISTRATE'S ANALYSIS.

Where as here, the mental impairment of depression was found to be severe, the ALJ was required to determine whether it met or equaled a listed mental disorder.  Since it did not, the ALJ was required to complete an MRFCA.  In this form, Dr. Rudy found that Plaintiff had moderate difficulties in maintaining social functioning.  The ALJ did not state that she explicitly incorporated the moderate social limitations but she did find that Plaintiff's difficulty in maintaining social functioning was compatible with the performance of Plaintiff's past relevant work of babysitter.

The ALJ asserted that she fully encompassed the entire record in assessing residual functional capacity, and the resulting residual functional capacity does not incorporate a greater limitation in social functioning than the limitation posed by Dr. Rudy (Docket No. 10, p. 20 of 478).  Accordingly, the Magistrate is persuaded that the ALJ's residual functional capacity

24

evaluation incorporated Plaintiff's moderate limitations in social functioning.

## V. Conclusion.

For the reasons set forth, the Magistrate affirms the Commissioner's decision denying

Plaintiff's eligibility for SSI benefits.

**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   September 11, 2013